**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **TEXAS ENTERTAINMENT ASSOCIATION, INC.,** | § § § | |
| *Plaintiff*, | § § | |
| **v.** | § § | **CIVIL ACTION NO.  1:20-cv-00707_____** |
| **GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS,** | § § § § | |
| *Defendant.* | § § | |

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY**
**AND INJUNCTIVE RELIEF**

Plaintiff Texas Entertainment Association, Inc. ("TEA"), files this Original Complaint for Declaratory and Injunctive Relief against Defendant, Glenn Hegar, Comptroller of Public Accounts of the State of Texas ("Comptroller").

**INTRODUCTION**

1.    The Comptroller selectively applies and enforces Texas Business & Commerce Code §§ 102.051—102.056, the "Fee Imposed on Certain Sexually Oriented Businesses" (the "$5 Fee Statute"), against one class of establishments—adult cabarets—to the exclusion of all other similarly situated commercial enterprises that also fall within the ambit of the statute's coverage.

2.    The TEA brings this action for declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 against the Comptroller for violating the First and Fourteenth Amendments to the United States Constitution. The TEA asks the Court to declare the Comptroller's enforcement regime unconstitutional as-applied to adult cabarets, and to permanently enjoin the Comptroller from continuing to apply and enforce the $5 Fee Statute against adult cabarets in violation of the Constitution.

## PARTIES

3.      Plaintiff Texas Entertainment Association, Inc., is a Texas non-profit corporation that conducts business throughout Texas. The TEA's membership consists of dozens of adult cabarets throughout the state that feature various forms of entertainment, namely exotic dancing. *Tex. Entm't Ass'n, Inc. v. Hegar*, 1:17-CV-594-LY, 2018 WL 718549, at *6 (W.D. Tex. Feb. 5, 2018) ("*Hegar*").

4.      Defendant Glenn Hegar, sued in his official capacity, is the Comptroller of Public Accounts for the State of Texas and may be served with process at 111 East 17th Street, Room 113, Austin, Texas 78701.

## JURISDICTION & VENUE

5.      Pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), this Court has original jurisdiction over all civil matters arising under the Constitution and laws of the United States, and to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity that the Constitution secures to the people.

6.      Plaintiff's claims for declaratory and injunctive relief are authorized under 28 U.S.C. §§ 2201-2202, along with Rules 57 and 65 of the Federal Rules of Civil Procedure.

7.      Venue of this case lies in the Western District of Texas pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and because Defendant resides and is headquartered in this district.

## FACTS

**I.      The Legislature Enacts the $5 Fee Statute.**

8.      The Texas Legislature enacted the $5 Fee Statute more than a decade ago. The law requires every "sexually oriented business" ("SOB") to pay the State of Texas five dollars for each entry of every customer admitted to the business. TEX. BUS. & COM. CODE § 102.052.

9.      An SOB is defined as any "nightclub, bar, restaurant, or similar commercial enterprise" that also—

> (A)   provides for an audience of two or more individuals live nude entertainment or live nude performances; and
> (B)   authorizes on-premises consumption of alcoholic beverages….

TEX. BUS. & COM. CODE § 102.051(2). The statute's definition of "nude" encompasses individuals who are either "(A) entirely unclothed" or "(B) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the person is female, or any portion of the genitals or buttocks." *Id.* at § 102.051(1)(A)-(B).

10.      Aside from these enumerated criteria, the $5 Fee Statute does not draw other lines between or among the businesses who are subject to its terms. The statute is not limited to businesses that feature particular forms of "live nude entertainment" or "live nude performance." Nor is its application limited to adult cabarets, that is, 'strip clubs,' 'gentlemen's clubs,' or 'topless clubs' that feature exotic dancing.

11.      The law's plain language applies to a myriad of establishments that are not adult cabarets. All nightclubs, bars, restaurants, concerts, theatrical performances, pageants, drag shows, body-building competitions, bikini contests, *etc.*, that feature live entertainment or performance

by men and women in various stages of undress in the presence of alcohol consumption are also subject to classification as SOBs and payment of the fee.

12.     Despite the statute's plain sweep, upon information and belief, at no point since its enactment has the Comptroller enforced the statute against any business that is not an adult cabaret.

## II.     The *Combs* Litigation Begets Years of Content-Based Enforcement.

13.     Shortly after its enactment, the TEA challenged the statute on various state law and constitutional grounds. After the TEA prevailed at the trial and intermediate appellate court levels, the Texas Supreme Court held in *Combs v. Texas Entm't Ass'n, Inc.* that the $5 Fee Statute, as written, comports with the First Amendment because it "is clearly directed, not at expression in nude dancing, but at the secondary effects of nude dancing when alcohol is being consumed." 347 S.W.3d 277, 287–88 (Tex. 2011).

14.     Although state courts declared that the $5 Fee Statute is a content-neutral law under the United States Supreme Court's 'secondary effects' jurisprudence, they said nothing about the manner in which the Comptroller could enforce or administer the law, nor could they; the Comptroller had largely refrained from actively enforcing the statute during the pendency of the *Combs* litigation.

15.     But once the *Combs* saga concluded in 2015, the Comptroller's office embarked on an ongoing campaign of extracting fees solely from adult cabarets, without reference to their status as SOBs *vel non*, or the purported negative secondary effects that the statute was intended to discourage.

**A.      The Comptroller targets non-SOB 'Latex Clubs'.**

16.     The Comptroller's determination to single-out adult cabarets for enforcement was most clearly manifested in his office's concerted efforts to extract retroactive fees from 'latex clubs' or 'bikini clubs.'

17.     'Latex clubs' and 'bikini clubs' are a subset of adult cabarets. They chose to avoid the fee by joining the host of similarly situated commercial enterprises that neither the statute nor the Comptroller had classified as SOBs. To do so, they opted to remove the "nude" component from their operations by requiring their performers to wear opaque latex coverings over their breasts and/or bikini tops, along with shorts covering their buttocks.

18.     The Comptroller did not tolerate these adult cabarets' efforts to avoid the $5 Fee Statute's reach. Even though these adult cabarets featured performers who wore attire no more scandalous than what can be seen at garden-variety sports bars staffed with scantily clad waitresses, the Comptroller's enforcement officers began a vigorous effort to enforce the statute against them. The experiences of two TEA members reflect a common fact pattern.

19.     Comptroller enforcement agents inspected Rick's Cabaret-Odessa and concluded that "this is a location in the action [sic] of a sexually oriented business." However, the entertainers at Rick's Cabaret-Odessa were required to wear opaque garments that fully covered all areas of anatomy specified in the $5 Fee Statute's definition of "nude" at the time of the inspection and during all relevant assessment periods.

20.     A few months later, Comptroller enforcement agents conducted a second inspection, resolving that the club "qualif[ied] as nude based on the definition of exposure of breast or buttocks." Reality, however, told a different story. While the performers were by no means completely concealed beneath large gowns, nor were they "nude" within the statutory definition.

21.     Based on these two inspections, the Comptroller issued fee assessments against Rick's Cabaret-Odessa in excess of $700,000 for multiple quarters over the span of the three preceding years.

22.     Rick's Cabaret-Odessa requested a redetermination hearing in State Office of Administrative Hearings ("SOAH"). The Comptroller's enforcement personnel visited the business yet again. In search of "nude" performance in order to trigger the statute's coverage, enforcement officers claimed to have observed a performer wearing "see-through shorts."

23.     The only transparent thing involved was the Comptroller's determined intent to classify the business as an SOB because it was an adult cabaret, regardless of the degree of "nudity" on display or others facts on the ground. Indeed, photographs of the performer in question showed that her attire was actually quite opaque and fully covered her buttocks.

24.     A few months later, the Comptroller's agents visited the club yet again. This time, enforcement officers reported observing entertainers wearing "volleyball shorts that exposed the buttocks," "bikini top[s] which exposed the inside side of the breast," and "see-through t-shirt and black thong." Once more, photographs of these performers told a completely different story—they were not "nude."

25.     As with Rick's Cabaret-Odessa, Rick's Cabaret-San Antonio also featured performers wearing opaque cloth garments over their breasts in order to comply with not only the $5 Fee Statute, but local ordinances as well.

26.     Nevertheless, Comptroller officers determined that the club qualified as an SOB despite the fact that it did not feature "nude" entertainment within the meaning of the statute. Enforcement officers allegedly "observed [a performer] performing a table dance wearing a pink bra and black shorts with lower buttocks exposed" and saw other performers wearing items ranging

from "a black t-shirt" and "blue zebra striped underwear that exposed lower buttocks."

27.     The following month, Comptroller enforcement officers reported observing two performers at the club wearing "red boy short bottoms exposing buttocks [but] not exposing breasts" and "blue boy short bottoms exposing buttocks [but] not exposing breasts." From this, the Comptroller resolved that the club somehow qualified as an SOB under the statute.

28.     Photographs of the performers at Rick's Cabaret-San Antonio told a different story. The performers in question had been wearing garments that were no more revealing than the skimpy uniforms that waitresses at so-called 'breastaurants' such as Hooters or Twin Peaks are required to wear. *See, e.g.*, *Tex. Alcoholic Beverage Comm'n v. Twenty Wings, Ltd.*, 112 S.W.3d 647, 655 (Tex. App.—Fort Worth 2003, pet. denied) (describing in findings of fact that "Hooters" waitresses "wear 'standard attire consisting of [a] low cut 'tank top' which accentuates cleavage, very short, tight orange shorts which can and do reveal the lower portion of the buttocks" and who "are, or can be, flirtatious with customers and it is part of the Hooter[s] method or manner of doing business for the waitresses to use their sex appeal or allure to generate sales of alcohol, food and merchandise").

29.     As illustrated in dozens of "Proposals for Decision," the Comptroller focused solely on enforcing the $5 Fee Statute against adult cabarets using the methods and justifications describe above.[1]

---

[1] *See, e.g.*, SOAH DOCKET NO. 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.20 ("The enforcement officers observed entertainers dancing in the club with parts of their buttocks and their breasts exposed. The enforcement officers determined that Petitioner was operating an SOB …. Petitioner adopted club rules and policies … requiring that the dancers wear at all times full tops and bottoms… One of the color photographs on the Dancer Work Rules poster shows a woman wearing a top with a deeply cut cleavage that reveals the sides of the breasts below the areola"); SOAH DOCKET NO. 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.20 ("The club's policy was that Petitioner's dancers wore bikini tops and bottoms that fully covered their buttocks…Staff did not inspect Petitioner's club during the periods at issue... [Comptroller] officers to visit the club and report on its status as an SOB... Staff located advertisements and photographs that were posted to the club's website and Facebook page during the assessment periods. The photographs showed women exposing portions of their breasts and buttocks");

**B.     The Comptroller memorializes discriminatory enforcement of the statute against adult cabarets in the Amended Rule.**

30.     However, a few 'latex clubs' did manage to successfully argue in SOAH proceedings that they had been improperly assessed the fee because they did not feature live "nude" performance or entertainment and did not qualify as SOBs.

31.     Faced with a few defeats, the Comptroller simply changed the written rules of the game, memorializing in the Texas Administrative Code a few of the tools and criteria his office used and continues to use to single-out adult cabarets. *See* 42 TEX. REG. 219, *amending* 34 TEX. ADMIN. CODE § 3.722 (the "Amended Rule").

32.     The amendments included a new construction of the word "clothing" as it appears within the statutory definition of "nude." The Comptroller defined "clothing" to mean—

> A garment used to cover the body, or a part of the body, typically consisting of cloth or a cloth-like material. Paint, latex, wax, gel, foam, film, coatings, and other substances applied to the body in a liquid or semi-liquid state are not clothing.

34 TEX. ADMIN. CODE § 3.722(a)(1). In promulgating this interpretation of the word "clothing," the Comptroller purposefully expanded the application of the statute to capture 'latex clubs' and 'bikini clubs,' that is, adult cabarets that did not otherwise qualify as SOBs. According to the Comptroller, "[e]stablishments that permit entertainers to apply liquid or semi-liquid latex are commonly referred to as topless clubs" and are therefore SOBs by default. 42 TEX. REG. at 221.

---

SOAH DOCKET NO. 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.20 ("The club required that a dancer's breasts were always covered by opaque latex while performing. Dancers wore bottom garments, but in order to ensure there was no exposure, dancers' buttocks were airbrushed with a product called Enduraskin"); SOAH DOCKET NO. 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.20 ("[t]he club manager testified that the club operates as a sports bar, with the dancers wearing full bikini bottoms and sports bras, with latex underneath the bras. The bikini bottoms must fully cover the buttocks and the tops must cover the breasts from the top of the areola to the bottom of the breast… The bikini bottoms are form-fitting but they fully cover the dancers' buttocks").

33.    To further leverage use of the statute solely against adult cabarets, the Comptroller employed the fiction that this new definition of "clothing" had always been the law, so therefore adult cabarets who had for years believed that they were operating outside the statute's scope found themselves faced with millions of dollars in retroactively applied fees, fines, and penalties.

34.    These two facets of the Comptroller's regime of targeting adult cabarets were patently unconstitutional. As the Western District of Texas concluded in *Hegar*, the Comptroller's contrived definition of "clothing" violated the First Amendment because it was obviously "directed at the essential expressive nature of latex clubs' business, and thus is a content-based restriction," and its retroactive application further violated due process. *See* Order Granting Partial Motion for Summary Judgment, *Hegar*, 1:17-CV-594-LY, [Dkt. No. 50, pp. 20-22], entered Feb. 27, 2019.

35.    But the retroactively applied definition of "clothing" was only one branch of the Comptroller's overall effort to single-out adult cabarets for enforcement. The Amended Rule also memorialized the Comptroller's policy of classifying all adult cabarets as SOBs based on a 'presumption' of their status. In fact, even in the absence of first-hand observations by Comptroller personnel—

> The comptroller will presume that a business is a sexually oriented business if the business holds itself out as a sexually oriented business. Evidence that the comptroller may consider includes signage, advertising, social media, publication of images, inspections, investigations, and the reputation of the business.

34 Tex. Admin. Code § 3.722(d)(3) (the "Presumption"). Then, "[t]o rebut the presumption, a business may prove by a preponderance of the evidence the instances in which the business did not operate as a sexually oriented business." *Id.*

36.     The justification offered for the Presumption was nebulous, to say the least. The Comptroller reasoned that "[t]hird party reports, such as reputational websites, are commonly relied upon by the public to select restaurants, plumbers, strip clubs, and other enterprises," so therefore government official could rely on similar forms of information to impose ruinously large fees on businesses. 42 TEX. REG. at 222.

37.     Of course, application of the Presumption yielded absurd results. For example, the Comptroller issued fee assessments against TEA member W.L. York, Inc., d/b/a "Cover Girls" for every quarterly period since January 1, 2009 amounting to hundreds of thousands of dollars in fees, penalties, and interest.

38.     There was one obvious problem—the business had been closed since 2009 because it had burned to the ground. Because the club was nothing more than a pile of ash and rubble, it was not operating, could not have possibly featured "live nude entertainment" in the presence of alcohol consumption during the relevant assessment periods, and had no obligation to pay any fees. Nevertheless, application of the Presumption meant that W.L. York still had to contest the classification.

**C.      The Comptroller's coercive 'inspections,' raids and seizures.**

39.     Coinciding with these efforts to deliberately expand the reach of the statute to include non-SOB adult cabarets, the Comptroller embarked on campaign to deter adult cabarets from challenging their arbitrary classifications or onerous fee assessments in administrative proceedings.

40.     For instance, shortly after a club named Jaguars El Paso prevailed in a SOAH proceeding, Comptroller agents and law enforcement officers from multiple agencies—clad in body armor and with assault rifles drawn—stormed inside the business during the late-night hours

of May 13, 2017. With a helicopter hovering overhead, officers raided the club, ejected staff members from the building, arrested patrons, and threatened to arrest a manager for videotaping the raid.

41.     The Comptroller's asserted justification for conducting the warrantless raid was that the incursion was a mere 'SOB inspection.' The net result of this militarized 'inspection' was that Comptroller officers discovered a handful of female performers wearing lingerie, allegedly including "a black thong," "white lace boy shorts and lingerie top exposing breasts," and "a one-piece bathing suit exposing breasts and buttocks."

42.     The Comptroller's draconian enforcement has also encompassed economic reprisal. TEA members Alam, Inc. and Panah, Inc., operated a club in Houston named "Mirage." They challenged over a million dollars in retroactively applied fee assessments. After the SOAH administrative law judge returned an adverse finding against the entities, they challenged the Comptroller's subsequent enforcement efforts in state court and obtained temporary restraining orders, one of which specifically prohibited the Comptroller "from engaging in any investigative or collections against Plaintiffs Panah, Inc. and Alam, Inc. related to the Sexually Oriented Business Fee assessed by the Texas Comptroller of Public Accounts."[2]

43.     The Comptroller's office ignored the TROs, continued to harass Alam and Panah, disrupted their business activities, threatened their landlord and their employees with penalties, seized cash and credit card transactions, and froze their bank accounts. Ultimately, the Comptroller's enforcement officers forcibly shut down the business.

---

[2] *Alam, Inc., et al., v. Comptroller of Public Accounts*, Cause No. D-1-GN-17-003987, 250th Judicial District Court, Travis County, Texas; *Alam, Inc., et al., v. Comptroller of Public Accounts*, D-1-GN-18-001936, 53rd Judicial District Court, Travis County, Texas.

44.     TEA member Duncan Burch, Inc. ("DBI") operates Chicas Locas in Houston. In 2015, the Comptroller assessed DBI with $3.9 million in retroactive fees for the period between May 2008 through November 2013—even though DBI was not operating Chicas Locas as an SOB during that timeframe.

45.     DBI challenged this enormous fee assessment in state court. In April 2019, with DBI's state court case on appeal, the Comptroller issued a "freeze order" on DBI's bank accounts and proceeded to levy thereon. Comptroller agents then raided the club and took all of the money from DBI's cash registers despite pleas from its counsel to negotiate a resolution.

46.     Ultimately, DBI was forced to file for bankruptcy protection "as a last-resort measure to prevent the Comptroller's aggressive and counterproductive collection activities from putting [DBI] out of business."[3] Of course, putting adult cabarets out of business is the entire point of the Comptroller's discriminatory enforcement of the statute.

## III.     No Businesses Similarly Situated to Adult Cabarets Have Paid the Fee.

47.     Despite numerous examples of the Comptroller's draconian enforcement of the $5 Fee Statute against adult cabarets (regardless of their SOB status), upon information and belief, his office has deliberately failed to enforce the statute against establishments whose business models center on serving alcohol to customers, featuring scantily-clad personnel, and who provide and openly advertise various forms of "live nude entertainment."

---

[3] *See* Declaration of Steven W. Craft [Dkt. No. 14], *In re Duncan Birch, Inc.*, Cause No. 19-41699-elm-11, United States Bankruptcy Court for the Northern District of Texas.

48.     This includes the hundreds of 'breastaurants' like Twin Peaks,[4] Ojos Locos Sports Cantina,[5] Tight Ends Sports Bar & Grill,[6] Bikinis Sports Bar & Grill, and Tilted Kilt Pub[7] that exist throughout the state.

49.     These businesses are also susceptible to classification as SOBs, yet, upon information and belief, they have never been required to pay the fee. Again, a survey of "Proposals for Decisions" and other materials available on the "State Tax Automated Research System" reveals that the only businesses who have been assessed the fee are adult cabarets.

50.     The Comptroller is in unique possession and control over the data that would reveal whether any specific non-adult cabaret establishments have ever been classified as SOBs subjected to the fee. Nevertheless, the Comptroller does not publicly disclose—and has previously refused to disclose—whether it has enforced the statute against any businesses other than adult cabarets.

51.     As a matter of fact, during the *Hegar* matter, "Defendant[] barely even argue[d] against" the proposition that adult cabarets are treated differently from their counterparts and "provided no empirical evidence to support the conclusion that it was not enforcing the Amended

---

[4] Twin Peaks – Corporate, *Join the Twin Peaks Team*, https://twinpeaksrestaurant.com/careers ("Nothing compares to a Twin Peaks Girl. … It's an invitation to be you, to be unique and to bring a one-of-a-kind experience to every guest, every time."); *see also* https://www.facebook.com/TwinPeaksKirby/photos (*last accessed,* June 23, 2020).

[5] Ojos Locos Cantina, *Become a Chica*, https://ojoslocos.com/about-us/careers ("Our chicas put the FUN in FIESTA bringing the Ojos Locos experience to life. Their COQUETANESS offers a fun and playful atmosphere to our guests. Chicas enjoy flexible scheduling, MUCHO DINERO, modeling and travel opportunities"); *see also* Ojos Locos Northline, "*It's $2 Bikini Tuesday! $2 Domestic Pints and $3 Import Pints all day,*" https://www.facebook.com/OjosLocosNorthline/ (*last accessed* June 23, 2020).

[6] Tight Ends, *Home Page*, https://tightendssportsbar.net/ ("THE BEST SPORTS BAR ANYWHERE, PERIOD! SELECTION OF BEERS…ENJOY A DRINK. DRESS UP WEDNESDAYS. WATCH SPORTS. LINGERIE FRIDAYS…); https://tightendssportsbar.net/gallery/ (depicting "nude" waitstaff) (*last accessed* June 23, 2020).

[7] Tilted Kilt Pub, *Casting and Careers*, https://tiltedkilt.com/careers/ ("…Imagine trying to land a role in a Hollywood movie or sexy fitness calendar; you want to look and act your best! These auditions are just the same. To land the role, you gotta play it up, girl!  Grab your favorite outfit, glam up your hair and make-up and visit a franchise location today for an audition.  You may end up being the next calendar cover girl!"); *see also* Tilted Kilt Pub and Eatery (Killeen, TX), *Hollywood Knockouts Oil Wrestling,* https://www.facebook.com/tkkilleen/photos/a.614678521909891/2522330807811310/?type=3&theater

Rule against sports bars and clubs due to lack of resources." Findings of Fact and Conclusions of Law ("FFCL"), *Hegar*, 1:17-CV-594-LY, [Dkt. No. 84, p. 27-28], entered March 6, 2020. This is because, in disregard of the statutory criteria for SOB status, the Comptroller has drawn an artificial distinction between adult cabarets and non-adult cabaret businesses because the former class of establishments feature a particular form of entertainment—exotic dancing.

52.    The impermissible line drawing is apparent on the face of the Comptroller's own reporting forms. For instance, Form 42-103, the "Sexually Oriented Business Observation Report," contains a checklist for inspectors to use when evaluating whether a business qualifies as an SOB. Only two concrete options for the types of performance observed are presented—stage performance or table dance.

53.    As found in *Hegar* with respect to the implementation of the Amended Rule, "[i]t appears clear that the Comptroller intended that the Amended Rule bring only latex clubs within the purview of the $5 fee statute and not other similar establishments…." FFCL, *Hegar*, 1:17-CV-594-LY, [Dkt. No. 84, p. 27-28]. "The State of Texas treats latex clubs differently from similarly situated commercial enterprises…." *Id.* The same reasoning holds true for *all* adult cabarets. Regardless of whether they qualify as SOBs or not, adult cabarets are singled-out for enforcement and classification as SOBs. The myriad of similarly situated businesses that feature "live nude entertainment" of different stripes are left untouched and are exempted by the Comptroller.

## CAUSES OF ACTION

54.    Section 1983 provides the vehicle for redress of a violation of constitutional rights. A person who, acting under color of law, subjects or causes to be subjected any United States citizen to the deprivation of any rights, privileges, or immunities secured by the Constitution, shall be liable to the party injured in an action at law. 42 U.S.C. § 1983.

55.     At all relevant times, and regarding all relevant actions of the Comptroller as alleged in this Complaint, Comptroller Glen Hegar has acted in his official capacity, under color of law, and pursuant to the official policies, practices, and customs of the office of the Comptroller.

56.     The Comptroller, acting under color of law, has subjected and caused the TEA's members to be subjected to the deprivation of their rights, privileges, or immunities as secured by the First and Fourteenth Amendments.

### COUNT I
### Violation of the First Amendment
### Free Speech Clause

57.     The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits enactment or enforcement of laws "abridging the freedom of speech." U.S. CONST. AMEND. I. "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010).

58.     The First Amendment's protections extend to forms of expressive conduct "sufficiently imbued with elements of communication." *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (citation omitted). "Entertainment … is protected; motion pictures, programs broadcast by radio and television, and live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). The Supreme Court has made clear that exotic dance and related forms of expression are protected and cannot be arbitrarily suppressed. *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).

**A.     The Comptroller uses content-based criteria to enforce the $5 Fee Statute against adult cabarets.**

59.     The Comptroller's differential, content-based application of the $5 Fee Statute renders the law violative of the First Amendment as-applied to the TEA's members.

60.    The $5 Fee Statute, by its terms, applies to all "nightclub[s], bar[s], restaurant[s], or similar commercial enterprise[s]" that provide "live nude entertainment" or performances for an audience of two or more people and that authorize on-premises consumption of alcoholic beverages. Tex. Bus. & Com. Code § 102.051(1).

61.    "[T]he fee is not intended to suppress expression in nude dancing." *Combs*, 347 S.W.3d at 288. Nevertheless, the Comptroller applies and enforces the $5 Fee Statute against the TEA's members solely because of the type of expressive content they offer—exotic dancing—and in order to suppress that form of expression.

62.    As described above, this animus is illustrated in the fact that adult cabarets presenting exotic dance have been continually selected for enforcement and assessed the fee even if they do not otherwise qualify as SOBs under the statute. In contrast, the Comptroller does not enforce the $5 Fee Statute against similarly situated businesses that qualify as SOBs but do not feature exotic dancing.

63.    For purposes of enforcing the $5 Fee Statute, the Comptroller has engrafted a content-based, non-statutory criterion into the law's language in order to actuate his disparate enforcement policy against the TEA's members. This unlawful favoritism—animated, shaped, and executed through the targeting of an expressive element not embraced within the content-neutral parameters of the statute—is "particularly repugnant to First Amendment principles." *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 229 (1987).

**B.    The Comptroller's use of the Presumption to classify businesses as SOBs inhibits protected speech.**

64.    In all applications, the Comptroller's use of the Presumption (whether embodied in an administrative regulation or as a *de facto* policy) to classify businesses as SOBs subject to the statutory fee has a chilling effect on speech.

65.     The Comptroller posits that "[e]ven in the absence of first hand observation by comptroller personnel, the comptroller may presume that a business is a sexually oriented business if the business holds itself out as a sexually oriented business," or if "third party reports, such as reputational websites," the Presumption applies. 42 TEX. REG. at 222; 34 TEX. ADMIN. CODE § 3.722(d)(3). The Comptroller issues onerous fee assessments against presumed SOBs, who then bear the burden of rebutting the Presumption with "evidence [of] the instances in which the business did not operate as a sexually oriented business." *Id*.

66.     Thus, a non-SOB adult cabaret (or any business for that matter) that exercises its protected right to advertise or market itself in a manner that could be deemed by the Comptroller as "holding itself out as a sexually oriented business" runs the substantial risk of incurring hundreds of thousands of dollars in crippling fee assessments for engaging in protected speech, that is, mere advertisement that may have nothing to with the actual occurrence of "live nude entertainment."

67.     The only way for adult cabarets in particular to avoid being faced with an enormous levy is to remain silent, and, as the Comptroller states, constantly police the internet to ensure that no one else holds them out as SOBs. In this way, the Presumption encourages, if not requires, self-censorship. As the Comptroller stated in the Texas Register, "[i]f businesses are concerned that their reputations are being falsely impugned, businesses can reply to third party reviewers or post their own signage, advertising, social media, or images disavowing topless or nude activities." 42 TEX. REG. at 222.

68.     The chilling effect is amplified by the lack of objective criteria shaping the application and use of the Presumption. Its breadth—and the 'evidence' that the Comptroller may rely upon—is unconstitutionally vague, overbroad, and unbounded. A business that sells alcohol

and merely displays on its website a female model wearing a bikini subjects itself to SOB classification and imposition of retroactive fee assessments even if it does not, in fact, feature "live nude entertainment" within the statute's meaning.

69.     This evidentiary device is nothing more than a tool leveraged to bypass the statute's requirements and to issue arbitrary assessments. The Comptroller uses the Presumption to reinforce enforcement of the statute solely against adult cabarets based on the expression they offer both within and without their walls. "The First Amendment prohibits the vesting of such unbridled discretion in a government official." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

70.     Moreover, as explained below, "when the constitutional right to speak is sought to be deterred by a State's general taxing program due process demands that the speech he unencumbered until the State comes forward with sufficient proof to justify its inhibition." *Speiser v. Randall*, 357 U.S. 513, 528–29 (1958).

### COUNT II
### Violation of the Fourteenth Amendment
### Equal Protection & Due Process Clauses

71.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides, in relevant part, that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. AMEND. XIV. It is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). The Fourteenth Amendment "protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class." *Allegheny Pittsburgh Coal Co. v. County Com'n of Webster County, W. Va.*, 488 U.S. 336, 345 (1989), quoting *Hillsborough v. Cromwell*, 326 U.S. 620, 623 (1946).

A.     **The Comptroller discriminatorily applies and enforces of the $5 Fee Statute against adult cabarets.**

72.     As-applied to the TEA's members, the Comptroller's discriminatory application and enforcement of the $5 Fee Statute solely against adult cabarets violates the Fourteenth Amendment. "As the Supreme Court explained long ago, equal protection of the law requires not only that laws be equal on their face, but also that they be executed so as not to deny equality." *Mahone v. Addicks Util. Dist. of Harris County*, 836 F.2d 921, 932 (5th Cir. 1988), citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886).

73.     The $5 Fee Statute provides three content-neutral criteria that define the class of "sexually oriented businesses" subject to the fee: they must be (1) "a nightclub, bar, restaurant, or similar commercial enterprise" that (2) "provides for an audience of two or more individuals live nude entertainment or live nude performance" and (3) "authorizes on-premises consumption of alcoholic beverages." TEX. BUS. & COM. CODE § 102.051(2).

74.     With these statutory criteria in mind, the TEA's members and all adult cabarets are, in every relevant respect, similarly situated to the range of non-adult cabarets that may and do also qualify as SOBs under the $5 Fee Statute.

75.     As explained herein and in *Hegar*, "the plain language of the $5 Fee Statute applies to sports bars and grills with scantily-clad bikini attired waitresses that serve alcohol and perform choreographed dances…." *See* FFCL, *Hegar*, 1:17-CV-594-LY, [Dkt. No. 84, p. 26]. The array of non-adult cabaret SOBs extends to sporting events where alcohol is served to cheering fans who are entertained by scantily clad cheerleaders, burlesque shows that serve dinner and alcohol to audiences that watch disrobed entertainers performing scripted routines, bodybuilding competitions that serve alcohol to audience members who judge the physiques of competitors wearing little more than string bikinis, and concerts that feature musical artists costumed in

revealing or transparent attire.

76.     Additionally, as with adult cabarets, non-adult cabarets subject to the statute are similarly situated in that they routinely "hold [themselves] out as a sexually oriented business." As shown in footnote 4, *supra,* there is no question that establishments like "Hooters markets, both via its website and/or in the restaurant, numerous merchandise items bearing pictures of Hooters girls wearing swim wear in sexually alluring, stimulating or provocative poses. Such merchandise includes but is not limited to cups, playing cards, calendars, newsletters, magazines and computer screen saver disks." *Twenty Wings, Ltd*., 112 S.W.3d at 655.

83.     Nevertheless, the Comptroller does not classify these non-adult cabarets as SOBs. Nor does the Comptroller choose to apply the Presumption to classify non-adult cabarets as SOBs based on the way that they openly hold themselves out. The Comptroller "only enforce[s] [the statute] against a certain class of establishments, namely adult cabarets or specifically latex clubs, which is constitutionally problematic." FFCL, *Hegar*, 1:17-CV-594-LY, [Dkt. No. 84, p. 26].

84.     The line drawing is obvious. The only salient distinction between adult cabarets and non-adult cabarets that are also SOBs is that the former offers exotic dancing. The Comptroller does not apply the statute against non-adult cabarets that feature other forms of "live nude entertainment" or "live nude performance" so long as those performative acts do not fit the mold of exotic dancing.

85.     The Comptroller's differential application of the $5 Fee Statute solely against adult cabarets is intentional, purposeful, and motivated by an improper purpose—the desire to prevent and squelch the exercise of rights protected by the First Amendment. *Wayte v. U.S*., 470 U.S. 598, 608 (1985). The totality of the relevant facts demonstrates the discriminatory intent.

86.    The Comptroller crafted the Presumption—a legal fiction sans any objective criteria tethered to the statute's language—for specific use and streamlined enforcement of the statute solely against adult cabarets, regardless of their status as SOBs or non-SOBs. Upon information and belief, the presumption has never been applied to non-adult cabarets despite their pervasive advertising, social media, publication of images, and reputations as establishments that serve alcohol and feature waitresses who entertain customers while in various states of nudity.

87.    The Comptroller's animus is further displayed in the selective and discriminating application of the statute's definition of "nude." The Comptroller will and has classified adult cabarets as SOBs if they feature performers who leave uncovered or visible "_any_ portion of the breasts below the top of the areola of the breasts … or _any_ portion of the … buttocks." TEX. BUS. & COM. CODE § 102.051(1)(B) (emphasis added). The Comptroller will and has classified adult cabarets as SOBs merely because they featured entertainers with just a few square inches of their buttocks or breasts exposed.

88.    In contrast, the degree of what qualifies as "nude" is virtually unbounded when it comes to non-adult cabaret SOBs. The Comptroller does not classify similarly situated businesses as SOBs even if their personnel are clad in bikinis, wet t-shirts, volleyball shorts, see-through garments, and other kinds of skimpy attire that reveals anatomical areas that would cause the personnel to be "nude" under the plain language of the $5 Fee Statute.

89.    The Comptroller's differential application of the $5 Fee Statute has a discriminatory effect. It is common knowledge among the TEA's members, and within the bar and restaurant industry more broadly, that the Comptroller only enforces the fee against 'strip clubs' and that only adult cabarets have paid the fee. Non-adult cabaret businesses that qualify as SOBs are effectively exempted from the statute's reach.

**B.      The 'Presumption' violates the Equal Protection and Due Process Clauses.**

90.     The Presumption violates both the Equal Protection Clause and the Due Process

Clause of the Fourteenth Amendment. "The law is clear that due process interdicts the adoption

by a state of an irrebuttable presumption, as to which the presumed fact does not necessarily follow

from the proven fact." *Andrews v. Drew Mun. Separate Sch. Dist*., 507 F.2d 611, 614 (5th Cir.

1975). The same reasoning applies to "rebuttable" presumptions. "A permissive inference violates

the Due Process Clause only if the suggested conclusion is not one that reason and common sense

justify in light of the proven facts …." *Francis v. Franklin*, 471 U.S. 307, 314–15 (1985).

91.     The Presumption itself, and its application, violate due process. The presumed

fact—existing or continued SOB status—does not necessarily follow from the basic fact—that

"the business holds itself out as an [SOB]" based on "advertising, social media, publication of

images … and the reputation of the business." On this nebulous basis, the Comptroller assesses

adult cabarets tens of thousands and even hundreds of thousands of dollars in retroactively imposed

fees, fines, and penalties under the statute.

92.     The Presumption also violates equal protection in that it creates, in effect, a rule or

classification of SOB status without reference to the statute's criteria or the facts supporting such

criteria, but based on expression. As set forth above, the Comptroller deploys the Presumption to

issue crippling fee assessments solely against adult cabarets, who must then challenge those

assessments in SOAH or else close their doors because they cannot pay those vast assessments.

93.     The use of the Presumption is a means of eliminating a certain form of speech

through economic coercion. "[W]hile the fairness of placing the burden of proof on the taxpayer

in most circumstances is recognized, this Court has not hesitated to declare a summary tax-

collection procedure a violation of due process when the purported tax was shown to be in reality

a penalty for a crime." *Speiser v. Randall*, 357 U.S. 513, 524–25 (1958). Because "the transcendent value of speech is involved," due process requires the State to bear the burden of persuasion to show that alleged SOBs qualify as such under the terms of the statute, not that they engaged in a form of speech. *Id.*

## CONSTITUTIONAL STANDARD OF REVIEW

94.     Under both the First and Fourteenth Amendments, the Comptroller's differential application and enforcement of the $5 Fee Statute is presumptively unconstitutional and subject to strict scrutiny. "[I]f a classification does target … or impact a fundamental right, it will be strictly scrutinized and upheld only if it is precisely tailored to further a compelling government interest." *Sonnier v. Quarterman*, 476 F.3d 349, 368 (5th Cir. 2007).

95.     The Comptroller's policy and method of enforcing the $5 Fee Statute solely against adult cabarets because they feature a particular form of expressive conduct that is not featured at or traditionally associated with non-adult cabaret businesses does not serve the State's interest in reducing negative secondary effects.

96.     There is nothing "narrowly tailored" about imposing the $5 Fee Statute on an entire class of business solely because they are adult cabarets that feature exotic dancing, a qualification that does not appear in the statute. Nor can it be said that the Presumption's unbounded parameters constitute a "narrowly tailored" tool or application of the statute. *Police Dept. of City of Chicago v. Mosley,* 408 U.S. 92 (1972) ("The Equal Protection Clause requires that [laws] affecting First Amendment interests be narrowly tailored to their legitimate objectives").

97.     The Comptroller's content-based policy and method of enforcing the $5 Fee Statute is subject to strict scrutiny regardless of any "benign motive" or "content-neutral justifications." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2228 (2015). Innocent motives do not eliminate

the danger of censorship presented by an ostensibly content-neutral statute wielded to selectively suppress a particular form of expression featured by a discrete class of businesses.

98.     In the alternative, the Comptroller has no rational or legitimate state interest in enforcing the $5 Fee Statute solely against adult cabarets to the exclusion of similarly situated businesses. The Comptroller's content-based delineation between businesses that fall within the statutory classification is not rationally related to furthering any governmental interest. If the object is, "[a]s noted by the supreme court… to address the adverse secondary effects of combining nude entertainment with alcohol consumption, both by discouraging the activity through higher taxation and by generating revenue for programs designed to address the social harms that result," *Tex. Entm't Ass'n, Inc. v. Combs*, 431 S.W.3d 790, 800 (Tex. App.—Austin 2014, pet. denied), the levy must be applied equally to *all* commercial venues that combine alcohol consumption with nude entertainment, not just some of them.

99.     There is no rational basis for the disparate treatment. It is irrational for the Comptroller to narrowly target only adult cabarets when broader application consistent with the statute's scope would generate *more* revenue for the statute's intended purpose—mitigating social harms that purportedly emanate from the combination of "nude" entertainment and alcohol.

100.     Moreover, merely because a business is an adult cabaret does not mean that it is more likely to cause negative secondary effects than mainstream businesses whose business models are built around the combination of scantily clad "nude" entertainment with the consumption of alcohol. *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) (holding that it was irrational for Texas to require a home for the mentally disabled to obtain a permit when other residences—like fraternity houses and apartment buildings—did not).

101.    Of course, the rational objective of generating revenue is beside the point because the Comptroller's acts are motivated by an improper consideration—the desire to prevent and inhibit the exercise of certain kind of protected expression. *See Bryan v. City of Madison*, 213 F.3d 267, 277 (5th Cir. 2003). The Comptroller enforces the $5 Fee Statute against TEA members with the intent to inhibit their right to feature erotic expression and punish them for their station as 'strip clubs.' This is an illegitimate use of state power to exact fees; "[m]oral disapproval of a group cannot be a legitimate governmental interest under the Equal Protection Clause because legal classifications must not be drawn for the purpose of disadvantaging the group burdened by the law." *Lawrence v. Texas*, 539 U.S. 558, 583 (2003).

## REQUEST FOR DECLARATORY & INJUNCTIVE RELIEF

102.    The TEA seeks declaratory relief pursuant to Section 1983 and 28 U.S.C. §§ 2201-2202. *Christian Legal Soc'y Chapter of the Univ. of Cal. v. Martinez*, 561 U.S. 661, 673 (2010) (section 1983 suit brought for violations of First and Fourteenth Amendments sought injunctive and declaratory relief). The TEA asks the Court to declare that the Comptroller's policy and method of applying the $5 Fee Statute against the TEA's members, unconstitutional as follows:

(a)    The Comptroller's policy and method of enforcing the $5 Fee Statute against adult cabarets because of the kind of expression they feature is an impermissible content-based application of a facially neutral statute in violation of the First Amendment;

(b)    The Comptroller's policy and method of selectively classifying and enforcing the $5 Fee Statute solely against adult cabarets—and the correlated failure to enforce the $5 Fee Statute against similarly situated businesses that also qualify as SOBs—constitutes a denial of equal protection pursuant to the Fourteenth Amendment; and

(c)    The Comptroller's application of the Presumption violates the First Amendment

because it inhibits protected speech and violates the Due Process Clause of the Fourteenth Amendment.

103.    As more fully set forth above, the Comptroller's policy and method of unequal application and enforcement of the $5 Fee Statute demonstrate that the TEA has a substantial likelihood of success on the merits.

104.    A failure to grant the injunction will result in irreparable injury to the TEA's members in the form of continued deprivation of their rights, privileges, and protections afforded under the Constitution. They will be permanently singled-out for disparate enforcement, thereby transforming the $5 Fee Statute into what the legislature and state courts strenuously claimed it was not—a fee solely imposed on 'strip clubs' because of their expressive activities.

105.    This injury outweighs any damage that an injunction may cause the Comptroller, who will still be entitled to execute his duties under the $5 Fee Statute and collect fees.

106.    An injunction will serve the public interest because an injunction will have the effect of compelling the Comptroller to apply the statute equally to a broader class of businesses as contemplated under the statute, which will in turn enhance his office's effort to collect revenue from more business that combine nudity and alcohol, just as the legislature intended.

107.    Accordingly, the TEA requests a permanent injunction against the Comptroller, his agents, servants, and employees, and all person acting under, in concert with, or for the office of the Comptroller, enjoining them from —

(a)    enforcing the $5 Fee Statute against adult cabarets because of the kind of expression they feature; and

(b)    selectively enforcing the $5 Fee Statute solely against adult cabarets.

## ATTORNEYS' FEES

108.    Plaintiff requests payment of its reasonable attorneys' fees and costs. Plaintiff is entitled to recover reasonable and necessary attorneys' fees and expert fees. 42 U.S.C. § 1988.

## PRAYER

WHEREFORE, Plaintiff, Texas Entertainment Association, Inc., respectfully requests that judgment be entered in its favor and that it be awarded the following forms of relief:

    a.    Injunctive and declaratory relief;

    b.    Attorneys' fees;

    c.    Expert fees;

    d.    Costs of suit; and

    e.    All other relief, in law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

WALLACE & ALLEN, LLP

*/s/ Casey T. Wallace*
Casey T. Wallace
State Bar No. 00795827
Benjamin W. Allen
State Bar No. 24069288
William X. King
State Bar No. 24072496
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
cwallace@wallaceallen.com
ballen@wallaceallen.com
wking@wallaceallen.com
**ATTORNEYS FOR PLAINTIFF**